# Commonwealth *versus* The Franklin Canal Company.

1. By the Act of 9th April, 1849, authorizing the Franklin Canal Company to construct a railroad from the north end of the Franklin division of the Pennsylvania Canal to Lake Erie, and from the south end thereof to Pittsburgh, " by such route as the said company shall deem most expedient and advantageous," it was intended to have a connection by railroad between Pittsburgh and Lake Erie.

2. The construction of a railroad beginning at the depot of the Erie and North-East Railroad, *about three-quarters of a mile from Lake Erie,* and extending westward to the Ohio line, and there connecting with the railroad extending to Cleveland, is not a compliance with the provisions of the said Act of 1849, but is in violation of the duty imposed by said Act.  The road constructed differs at each extremity from the road authorized by the Act—is different in character, location, and object, and is used for purposes opposite to those for which the road was authorized by the Act.

3. Though the Act of 1849 authorizes the road to be constructed between the extreme points " by such route as the company shall deem most expedient and advantageous," this does not authorize the company in the location of the road to consult their own advantage ; but the advantage of the route as *a route* between the points designated in the Act was intended.

4. A railroad company chartered by the state of Pennsylvania cannot, on general principles, connect its road with a railroad which meets it at the state line, unless such connection be plainly authorized by law, or unless it cannot be avoided without losing the advantages of what was clearly the best route.

5. Such a connection is also in violation of the spirit, if not the letter, of the Act of 15th April, 1851, which forbids all connection by means of private railroads with any railroad authorized by the laws of New York or Ohio.

6. It is not sufficient that the company in question *intend* to extend the road to Franklin, the point of beginning of the road authorized by the Act.  The present construction of the road is to determine the case.

7. By the Act of 6th May, 1844, no *preliminary* injunction is to be granted unless a bond has been given by the plaintiff " with sufficient sureties conditioned to indemnify the other party for all damages that may be sustained by reason of such injunction."  The Commonwealth when plaintiff is included in this provision.

[Commonwealth *v.* Franklin Canal Company.]

THIS was a proceeding in the name of the Commonwealth, on a bill signed by the Attorney-General, and presented to the Supreme Court at Pittsburgh, on October 11, 1852. A motion was made for a special injunction to issue to the Franklin Canal Company, and on the 16th October, counsel appearing for the company, the Court ordered the motion for a special injunction to stand over for hearing at Philadelphia, on the 2d Monday of December following.

In the bill an injunction was asked against the construction and use of the railroad constructing by the Franklin Canal Company, extending from the city of Erie to the Ohio state line.

The Act to authorize the governor to incorporate the Franklin Canal Company, was passed on 27th April, 1844, (*Acts*, page 471, &c.) By the 3d section of the Act it was provided, " That immediately upon the issuing the letters patent by the governor, as provided by the second section of this Act, the Franklin division of the Pennsylvania Canal from the aqueduct over French Creek, on the French Creek feeder, to the mouth of French Creek, shall be immediately vested in the said corporation authorized to be created by this Act and their successors for ever, unless the Commonwealth should resume the said division under the provisions of the eighth section of this Act," &c.

By the 6th section it was provided that whenever two thousand or more shares of stock shall have been subscribed (which by the first section of the Act was to be $25 per share), the said company shall be authorized to reconstruct or repair the said canal and slackwater navigation; and may substitute canal for slackwater, &c., and it was provided, that when four miles of the line were completed, they might by license from the governor be authorized to collect tolls.

By the 8th section it was declared that at any time thereafter, it should be lawful for the Commonwealth, upon the passage of a law by the legislature for that purpose, to resume the canal, &c., upon paying the company the amount expended by them for repairs and supervision, with interest thereon, &c.

By the 9th section it was enacted, that if the company be not organized before the *first* of May, 1846, the privileges granted by the Act were to be null and void.

By the 8th section of an Act approved on 9th April, 1849, (*Acts*, p. 766), authority was given to the Franklin Canal Co. to elect officers at any time before the 1st of August, 1849; and it was enacted that no failure before to elect officers, or any other irregularity, should be taken or construed to work a forfeiture of the charter of the company.

By the 9th section it was enacted, "that the said company, instead of constructing a canal, or completing and repairing the work done by the Commonwealth, have the privilege of construct-

[Commonwealth v. Franklin Canal Company.]

ing a *railroad* if deemed the most expedient, and to use the graded line or towing path of the said canal as the bed of the said road."

Section 10. " That upon the said company's increasing the stock to the amount of five hundred thousand dollars, it shall have the privilege of extending from the north end thereof to Lake Erie, and from the south end to Pittsburgh, *by such route as the said company shall deem most expedient and advantageous;* the said railroad shall be constructed subject to all the provisions and restrictions of an Act regulating railroad companies, passed the nineteenth day of February, A. D. one thousand eight hundred and forty-nine," &c.

*In the bill* reference was made to the Act of 27th April, 1844, for the incorporation of the Franklin Canal Company ; to the Act of 9th April, 1849, referred to, and to a provision in the Railroad Act of 19th February, 1849, requiring the payment of $5 on each share of stock subscribed for.

It was charged that the Franklin Canal Company failed to become organized within the time limited by the Act of 27th April, 1844, and that the privileges granted to it by that Act became void. But if such rights were restored to it by the Act 9th April, 1849, that it was the meaning of the said Acts of April, 1844 and 1849, that it should enjoy such rights upon the subscription of the first 2000 shares of stock, and of constructing or repairing the canal or slack-water navigation along the line of the Franklin division of the Pennsylvania Canal from the aqueduct over French Creek, to the mouth of French Creek ; or instead of constructing a canal or completing the repairing of the work done by the Commonwealth, constructing a railroad, if deemed most expedient, *between the same points* only, through and over the same route, and using the graded line or towing path of the said canal as the bed of the said road, and no other or greater privilege whatever ; and that upon the increase of their capital stock to the amount of $500,000, the said company were to have the additional privilege of extending their railroad or other improvements from the north end of the said Franklin division, as aforesaid, to Lake Erie, and from the south end thereof to Pittsburgh.

It was further averred to have been the meaning of the legislature, that the first 2000 shares of stock should be applied to the reconstruction or repair of the work on the Franklin division, or the construction of a railroad between the aqueduct and the mouth of French Creek ; and that the construction of the railroad, canal, or other improvement between such points, was a condition precedent to the exercise by the company of the additional privilege of *extending* the same from the north end thereof to Lake Erie, or from the south end to Pittsburgh.

It was averred that the said company had not constructed or

[Commonwealth *v.* Franklin Canal Company.]

repaired the said canal, or any portion of railroad along the line of the Franklin Canal, from the aqueduct over French Creek, on the French Creek feeder to the mouth of French Creek; nor increased its capital stock to the amount of $500,000, within the terms of the Act of 19th February, 1849; but that the president of the company, confederating with citizens of Ohio and New York, constructed a railroad from the city of Erie along the shore of Lake Erie, to the Ohio state line, without any purpose of extending the same to the north end of the said Franklin Canal, but with the sole intent and design of forming a connection with another railroad in process of construction, under the laws of Ohio, from Cleveland, in that state, to the Ohio state line, known as the Cleveland, Painesville, and Ashtabula Railroad. And it was further alleged that if said company had the power to construct the railroad northward from the terminus of the Franklin Canal to Lake Erie, without constructing or repairing the canal, or constructing a railroad along its line, yet that the design of the Acts was that the road should be constructed northward from the canal in as nearly a straight line as the nature of the ground would allow, to Lake Erie, at the most practicable and convenient point for commercial purposes on said lake.

It was averred that the necessary consequence of the construction of the road from Erie along the lake to the Ohio state line, and the contemplated connection with the Cleveland, Painesville, and Ashtabula Road, will be to divert the trade and travel of the country from the great line of public improvements.

It was further averred, that in the construction of the road from Erie to the Ohio state line, along the lake shore, they had located the same across the public highways of the Commonwealth, and several streets and lanes in the city of Erie.

After other suggestions, interrogatories were submitted:

It was asked that the company be restrained from proceeding in the construction of the road from Erie to the Ohio state line or its vicinity, and from using the same when completed—from misapplying the funds of the company—from crossing or interfering with the public highways within the county of Erie or elsewhere, and that such other relief be granted as the equity of the case may require.

In the plea and answer the company claimed the benefit of the letters patent.

It was also answered that in pursuance of the Act of 27th April, 1844, 200 shares of the stock were duly subscribed, and the subscription certified a sufficient time before the 1st of May, 1846, to enable the governor to issue the letters patent and the company to organize before that date; but owing to some cause, not attributa-

ble to them, the company was not organized till the 21st May, 1846.

That by the Act of 9th April, 1849, the company was authorized to elect officers at any time before the 1st August following, and it was provided that no failure to elect shall work a forfeiture of the charter; also that the company made annual reports; that it has paid into the treasury of the Commonwealth, the amount of taxes assessed by law on its corporate stock.   Also, that by the 3d section of the Act 27th April, 1844, the Franklin division of the Pennsylvania Canal, from the aqueduct over French Creek to the mouth of French Creek, was vested in the said company, and all the real and personal estate owned by the Commonwealth for the use of the canal, subject to the right of the Commonwealth to resume it upon compensation to the stockholders.   That the work so vested in the company, consisted in part of slack water in the bed of French Creek, and in part of sections of canal and locks.   That the state afterwards, in pursuance of an Act passed on 9th April, 1849, resumed the Franklin division of the Pennsylvania Canal, except the towing path, berm-bank, and bed of the canal along the said line.   That by the said Act of 1849, there was conferred upon the company privileges, 1. To construct a railroad instead of a canal: 2. To increase their capital to $500,000: 3. To build a railroad from the north end of the Franklin Canal to Lake Erie: 4. Also from the south end of said Franklin Canal to Pittsburgh: 5. And to adopt "such route as the said company might deem *most expedient and advantageous.*"

It was represented that one section of the railroad of the company, to wit, from the city of Erie to the west line of Springfield township in Erie county and the *east line of Ohio,* in length twenty-five miles and three-tenths, was completed and in use on 27th November, 1852.   That the said line was located in 1849, put under contract in January, 1850, and from that time the work was prosecuted; and that during that time the legislature was advised of the progress of the work.   That the company made a report to the legislature, dated February 13, 1850, that they had employed engineers to locate that portion of the work on the route contemplated in the original Act, and to extend their line north to Lake Erie, &c.

And it was suggested that, the Commonwealth having so long acquiesced in their action, and the respondents having made large expenditures under what they believed to be lawful authority, without objection or complaint on the part of the Commonwealth, the latter had no title to the relief in equity prayed for in the bill.

It was also alleged in the answer that the company preferred to finish the section from the city of Erie, to that point where the route of the road would connect with a railroad *from Cleveland,*

[Commonwealth *v.* Franklin Canal Company.]

for the reason that that section would immediately yield income and aid the means and credit of the company; thereby enabling them better to proceed with their section of road to the aqueduct over French Creek. The right to construct the road from Erie to the Ohio line, which was the road complained of, was claimed on the part of the company under the authority given in the Act of 9th April, 1849, to construct the road from the north end of the Franklin Canal to Lake Erie, "by *such route as the said company shall deem most expedient and advantageous;*" and a statement was made in the answer for the purpose of showing that the course of the company had been prudent and proper; and the route on which their road had been constructed *expedient and advantageous.*

It *was alleged in the answer,* that two routes for a railroad existed between the aqueduct over French Creek and Lake Erie. That *one* of the routes called the French Creek and Waterford route, passes from Erie in a direction generally south-eastwardly (though tortuous between Erie and the Le Bœuff summit), to the vicinity of Waterford; thence in a generally southern direction along the valleys of the Le Bœuff and French Creeks to the aqueduct. The *other* passes from Erie, in a south-westwardly and very straight course, nearly parallel with the lake-shore, and with the ridges extending in the same direction, to the township of Springfield, in Erie county, where, turning to the south, it passes southwardly and south-eastwardly, along the open valley or depression of the Conneaut, crossing the summit, and thence in a south-eastwardly direction to the aqueduct. That of these two routes the engineers and directors of the Franklin Canal Company preferred the latter as most expedient and advantageous, both to the company and the public. It was further alleged that upon principles of engineering, the second or Conneaut route was the most expedient and advantageous; but if the two routes were equal, that the Conneaut route was preferable on account of the easy and ready connections still further west, putting the said company in a situation to complete their whole road sooner than by any other route, and at the same time turning into Pennsylvania and Erie and upon the Sunbury and Erie Railroad, a large amount of travel and freight which would otherwise not be had, and affording to the citizens of Erie an opportunity of reaching Philadelphia by Cleveland and Pittsburgh, by a route no longer in distance than by the way of Dunkirk and New York.

It was further alleged that it was and had always been *the intention* of the company to construct the road from the harbor and city of Erie to the said aqueduct as soon as their means would permit, and fully to comply with the requirements of their charter; and that they had by resolution appropriated the net earnings of

the road to such construction, and had by reason thereof declared no dividend.

It was further said that the company had been advised and believe that it was not the intent of the legislature that the railroad northward, from the terminus of the Franklin Canal to Lake Erie, should be constructed northward from the said canal to Lake Erie, in as straight a line as the nature of the ground will admit.

It was further denied that the Commonwealth, by virtue of any power of redemption, or in any other manner, has any interest in the application of the means of this company; and if it has any interest, it was averred that it was not sufficient to support the bill. It was denied that the Lake Shore Road, or any part of it, had been constructed with a view to defeat the intention of the legislature in the creation of this company, or to hinder or defeat the construction of any portion of the road which the company was authorized to make.

It was denied that the necessary consequence of the construction of the railroad between the city of Erie and the Ohio state line was to divert the trade and travel of the country from the works of *this Commonwealth;* but that on the contrary, since the construction of this road, the business on the state works has largely increased.

It was admitted that the company had constructed its railroad across several highways, in the townships of Springfield, &c., and across several streets in the city of Erie; but it was averred that it did not cross the Lake Road or Lake Shore Road, as averred in the bill. It was averred that the company had the right to cross roads and streets, and that the roads and streets passed over are crossed by sufficient causeways constructed by the company on plans submitted - to the road commissioners of the several townships, or to the city councils of Erie, and approved by them.

It was further alleged that the said road, from Erie to the Pennsylvania state line, was a *post route*, under the Act of Congress, approved on 3d March, 1853, and that the mails of the United States are carried thereon under the authority of the Postmaster General, &c.

In another paper it was alleged that the company had purchased in fee simple all the land covered and used by their railroad between Crooked Creek and the Ohio state line, about five miles; and further, that they had purchased, in fee simple, all the land covered and used by their railroad between the city of Erie and the Ohio state line, except about half a mile near the city of Erie, in which they have purchased and held a perpetual right of way.

In relation to the issuing of injunctions, it is provided by the *first* section of the Act of 6th of May, 1844, as follows:—"That no injunctions shall be issued by any court or judge until the party

applying for the same shall have given bond, with sufficient sureties, to be approved of by said court or judge, conditioned to indemnify the other party for all damages that may be sustained by reason of such injunction."

The other sections of this Act refer to other subjects.

The case was argued at Philadelphia: *T. Williams* and *Wm. A. Stokes*, for the Commonwealth.

*Hirst* and *Meredith* were for the Company.

The opinion of the Court was delivered, January 10, 1853, by BLACK, C. J.—The Franklin Canal Company was incorporated by the legislature, on the 27th April, 1844, for the purpose of reconstructing and repairing the Franklin Division of the Pennsylvania Canal, from the aqueduct over French Creek to the mouth of French Creek. By the act of incorporation the proprietary rights of the state to that division of the canal was vested in the company, together with the surplus water-power, toll-houses, implements, and all property, real and personal, which the Commonwealth owned there for the use of the canal. On the 9th of April, 1849, the company was authorized to construct a railroad instead of repairing the canal, if they should think it more expedient, and to use the graded line or towing path of the canal as the bed of the road; and by the same act the privilege was granted to the company, upon increasing its stock to $500,000, of extending northward to the lake, and south to Pittsburgh.

The Attorney-General in the bill before us complains, on behalf of the Commonwealth, that the defendants, instead of doing what the act of incorporation, and the subsequent laws extending it, authorized them to do, have proceeded to construct a railroad from Erie to the Ohio state line, without any purpose of making the road between Franklin and the lake; but with the sole intent to form a connection with a railroad running from the state line to Cleveland. This the bill avers to be such an injury to the Commonwealth as can only be remedied by an injunction: because,—1. The Commonwealth is interested in the proper application of the funds of the company to the purposes for which it was chartered, the Franklin canal being given to it with the right to resume it to the use of the state. 2. A railroad from Pittsburgh to Erie would have been tributary to the works of the state; but the road actually made, will divert the trade and travel in another direction, to the diminution of the revenues and the detriment of the people. 3. The railroad is an unauthorized and illegal obstruction of certain public highways across which it passes. 4. It is inconsistent with the policy of the state to surrender the advantages which her position

[Commonwealth v. Franklin Canal Company.]

gives her of controlling the commercial intercourse between Ohio and New York. 5. If this surrender were consistent with policy, it is of great pecuniary value, and could be disposed of for a large sum.

The counsel on behalf of the Commonwealth have moved us for a preliminary injunction to restrain the defendants from proceeding with their work, or using it until the final hearing and determination of the cause. To sustain this motion, affidavits have been presented, from which it appears that the defendants have already made a railroad, commencing in the city of Erie, at the depot of the Erie and North-east Railroad (which extends into the state of New York), and terminating at the point where the Cleveland, Painesville, and Ashtabula Railroad strikes the line between Ohio and Pennsylvania. This road is now in use, carrying the freight and passengers which arrive in both directions on the respective roads with which it connects.

Numerous difficulties in the way of a preliminary injunction have been suggested by the defendants' counsel. But the great central point on which the rights of all parties must finally turn, is, whether the conduct of the Company in making the road they have made, is authorized by the charter. If it be not consistent with the act of incorporation, then it is a lawless aggression upon the clearest right, and the most valuable prerogative which a state can possess. It is in vain to deny that the Commonwealth has an interest in this business. To usurp the right of eminent domain, and establish a thoroughfare for the benefit of those who are not our citizens, by means of a railroad laid down on our soil without asking the leave of the government, is something more than a mere insult. It touches the revenues of the Commonwealth as well as her pride, and it is no imputation upon the honor and magnanimity of a state in debt forty millions of dollars, to say, that she is willing to protect both the pockets and the feelings of her people. It is not a disgrace that she thinks of justice to her creditors before she parts with her resources to those who have no claims upon anything but her courtesy. If the railroad complained of has been made in violation of law, it is such a wrong as will surely be righted somehow; and therefore those who are charged with committing it, will be glad to have our opinion, whether it be for them or against them. If it be true that the defendants have been guilty of conduct which cannot and will not be tolerated, the sooner they are made aware of the extreme peril to which they have exposed themselves, the better for them. For these reasons, principally, we proceed to examine the charter and its supplements, and to compare them with the acts of the company, that we may see how they agree together.

The original act of incorporation makes the company a gift of

L 2

the Franklin division of the state canal, from the aqueduct to the mouth of French Creek; together with all property, real and personal, which the Commonwealth owned for the use of that canal, and authorizes the reconstruction and repair of it by the company. The Act of 9th April, 1849, authorized them, instead of repairing the canal, to make a railroad, and to use the towing path for the bed of the road. Another section of the same Act contains this provision, "That upon the said company's increasing the stock thereof to five hundred thousand dollars, it shall have the privilege of extending from the north end thereof to Lake Erie, and from the south end thereof to Pittsburgh, by such route as the said company shall deem the most expedient and advantageous." It is upon these words that the defendants now rely to make out the lawfulness of constructing a railroad from the city of Erie to the Ohio state line.

We will not pause for a definition of the word *extend,* nor stop to consider whether the main purpose of the company's existence must be accomplished before an incidental privilege can be exercised. We will not inquire whether a railroad which does not exist, can be extended. If the defendants had obeyed their charter in other respects, we would be too anxious to protect them in the prosecution of their enterprise, to allow them to be defeated on points so sharp as these.

But assuming that the clause, quoted above, gives to the Franklin Canal Company the right simply to make a railroad from Pittsburgh to Lake Erie, without any restriction, expressed or implied, as to the part of the work which shall be first done (and this is the utmost that ought to be claimed), can we say that they are within the law in making a road from the city of Erie to the Ohio line? To this question, the only answer we can give is a most emphatic negative. The more we have reflected on the case and examined the affidavits and arguments of the defendants, the more deeply have our minds been penetrated by the conviction that the charter creates a simple duty, which has been most palpably violated.

No human mind can be so perverse as to doubt that the object of the legislature in passing the Act of 1849, was to make a connection by railroad between Pittsburgh and some harbor on the lake. Instead of this a connection has been made between Buffalo and Cleveland, with no more practical regard for either of the designated termini than if the corporators had never heard of them. The state contemplated an improvement which would bring a certain portion of the western trade through her own works to her own commercial cities. But the privileges she gave for that purpose, have been so perverted as to carry that trade away; increasing the wealth and adding to the advantages of her rivals.

[Commonwealth v. Franklin Canal Company.]

The road made by the defendants begins at the depot of the Erie and North-East Railroad, three-quarters of a mile away from the lake, and one hundred and ten feet above it, and runs thence as directly as the nature of the ground will permit, to that point on the Ohio state line where the Cleveland, Painesville, and Ashtabula Railroad meets it: and there it stops. The defendants ask us to give a solemn judgment that this is extending a road which has not been made between Franklin and the aqueduct, over French Creek, from the north end thereof to Lake Erie. We do not say that there is any obligation to begin at one place more than another, and if this could be properly called a part of the work required, it might very well be justified. But it is not part of the road chartered; it is the whole of another road not chartered. It bears no resemblance to that described in the act of incorporation. It is different at both ends—different in character, location, and object—and is used at this moment for purposes totally opposite to those which the legislature ever expressed an intention to permit.

But they urge that inasmuch as their act of incorporation permits them to extend the road from the aqueduct to the lake, "by such route as the said company shall deem the most expedient and advantageous," they are at liberty not only to begin at either end or in the middle, but to deviate from the natural and proper course for any purpose which may be advantageous to them; and they do not conceal that the profit of a connection with the Ohio road, is their motive for making it. This is a grave error. It is not their own, but the advantages of the route as a route, which they are permitted to consult. Between two routes they may choose the one which will, in their opinion, lead them most advantageously to the point fixed by law. But they must not turn aside to effect another and unauthorized purpose, however profitable it may seem to the finances of the company or the private fortunes of the stockholders. Every railroad company has and must necessarily be allowed to have the same discretion, which this one had, to choose the best route between fixed points; but the authority to depart from the route has never before been claimed. No one ever thought because the Pennsylvania Railroad Company had a right to choose its route between Harrisburg and Pittsburgh, that it therefore had a right to make a road from Harrisburg to Easton, or to Sunbury, or to the Maryland line; or that it could begin at Pittsburgh and go to Virginia, upon the plea that such a location would be best for the interests of the company. These are extreme cases, but they illustrate the principle. A deviation of half a mile to effect a forbidden purpose, is not more lawful than if it were a hundred miles out of the way.

Besides; we hold without doubt or hesitation that no railroad

[Commonwealth *v.* Franklin Canal Company.]

company can connect with a foreign railroad which meets it at the state line, unless expressly authorized by its charter, or unless such connection cannot be avoided without losing the advantage of what is clearly the best route.   If this be not so, the doctrine of strict construction is a mockery.   The right of determining to what extent and in what manner our territory shall be made a thoroughfare for the benefit of foreign corporations, belongs to the state herself.   It is so important to the interests of our own commerce and the prosperity of our own public works, that no proposal to surrender it has ever been made without grave deliberation, and seldom without more or less opposition.   The fiercest of our legislative struggles have been upon bills granting rights of way. The state will not be held to have parted with this right until she does so in plain words, of which the sense cannot be mistaken.   It will not pass by construction as an incident of the privilege to make a railroad between two designated points within the state.

This connection also violates the spirit if not the letter of the Act of 15th April, 1851, which forbids all connections by means of private railroads with any railroad authorized by the laws of New York or Ohio.   This act was intended to guard the territory of the state against lawless invasions like the present.   True, the prohibition does not extend to companies who profess to make such connections under their charters.   And why?   Because some of them are expressly authorized to make them, and those which are not so authorized, are impliedly forbidden—as much forbidden as if their cases were included in the terms of this act.

The question of state policy is nothing to us.   It is not for us to say whether or not it is just, generous, or prudent for the state to make railroads, or suffer them to be made by others, without regard to any consideration but the convenience of neighboring states.   If it be the policy of this Commonwealth to furnish such facilities to the trade of her rivals, the Franklin Canal Company is decidedly not the instrument she has chosen to carry it out; else it would have been so expressed in the charter.   But the law is otherwise written, and that is our only guide.

If the defendants had *happened* to make these connections at both ends of their road, in the prosecution of what they thought their duty, they might be entitled to more sympathy in their day of trouble than they are likely to have.   But such accidents never occur, and certainly did not occur in this case.   They must have known that the depot of the North-East Railroad was not a harbor on the lake, and they could not mistake the terminus of the Ohio road for the French Creek aqueduct.   They may not have known that it was wrong to make one road under a charter which authorized another, but to suppose that they thought them identical would require " the charity which believeth all things."

[Commonwealth v. Franklin Canal Company.]

It is said, however, that they *intend* to make the road to Franklin. This is a good intention certainly, but not good enough to sanctify an evil deed. It is no excuse for doing a wrong that they mean also to do a right. If they will immediately break up the connection complained of, and convert their work to the purpose which they say it was designed for, though it may not atone for the great fault they have committed, it will certainly be better than persisting in it.

But there are certain facts which indicate the absence of all such intention, unless at a very remote period. 1. Dividing eight per cent. of the net profits among the stockholders, is not applying all their means to the finishing of the work. 2. The agreement with the Ohio company is for an indefinite time. It covenants for the joint use of the road at the joint expense, and for the joint profit of the two companies. It makes no allusion to nor provision for an intersection from the direction of Franklin. 3. It is said on the part of the defendants that a survey was made for them of the whole line, from Franklin-to Erie, in the summer and fall of 1849, a report of which was made and adopted on the 10th of January, 1850. This report has been submitted to us, and it is entirely silent about all that part of the line between the first lock at the outlet of the French Creek feeder and the intersection with the road now in use. Where, how, or when that intersection is to be made we are not informed. The two divisions, located by this survey, seem to have been intended for different purposes, and as separate works, and not to be used together. The engineer, addressing the company at the close of his report, says, "The Erie division of your railroad will form a most important link in the great chain connecting the west with the east—the lakes with the sea-board—the producing with the manufacturing parts of the country," &c. He describes the object of the other division thus: "The Franklin section of your road will form a connection much wanted between the navigation of the Allegheny and that of the French Creek feeder, and will form a present continuous means of communication between Pittsburgh and Lake Erie, by way of the river, your road, the French Creek feeder, and the Extension Canal to the harbor of Erie."

The valley of the Conneaut is without doubt the best route from Erie to Franklin, if we believe the evidence before us. But we have no means of determining where the valley can be reached most easily from the lake-shore. A map has been submitted to us with the defendants' affidavits, on which the southward curve from the line of the finished road is marked at two places, one about five miles east of the Ohio line, and the other about half a mile. But neither of them appears to be the line of any survey. We are, however, perfectly well satisfied that the way to get into the

[Commonwealth *v.* Franklin Canal Company.]

valley of the Conneaut is not by the terminus of the Cleveland road. The route followed by the defendants goes very straight to that terminus, passing the points of divergence as if they were not there, and looking only to the west.

This is a motion for a preliminary injunction. The counsel of the defendants have urged many arguments, with great power, against the right of the plaintiff to claim it under the circumstances of this case. We could not think of granting such a motion without weighing these objections well, and finding a clear answer to each of them. But the discussion of them is unnecessary, since there is another insurmountable reason for refusing the motion. There is an Act of Assembly which, according to our construction of it, directly forbids the awarding of a preliminary injunction in any case where the Commonwealth is the plaintiff. The statute I refer to is that of 6th May, 1844, and says, "No injunctions shall be issued by any Court or judge, until the party applying for the same shall have given bond with sufficient sureties to be approved by said Court or judge, conditioned to indemnify the other party for all damages that may be sustained by reason of such injunction."

This of course does not mean final injunctions, which conclusively settles the rights of the parties, leaving no question of future damages. We cannot doubt that it was intended to prevent men's rights from being jeoparded by special injunctions awarded during the pendency of causes. The words are broad and general. They apply to all cases, and we cannot see upon what principle we could except a case in which the Commonwealth is plaintiff. But the Commonwealth can give no bond, there being no organ of the government authorized to execute it for her; and if she could give bond, she would not be suable on it. The law which forbids an injunction to be granted without bond from the party can only be obeyed, in this case, by refusing the injunction altogether.

This disposes of the matter for the present. We might have refused the motion without more than a mere reference to the statute which made it necessary. But after the elaborate and able argument of counsel, and the full affidavits submitted, we thought the parties entitled to some expression of our opinion on the main question. A mere naked statement of our conclusion without the reasons, would have been unjust to ourselves; and hence this somewhat extended discussion of it.

Mr. Justice GIBSON, who was prevented from sitting in the case, but who has considered it on the printed arguments, authorizes me to say, that he fully concurs in the views of the majority, as I have expressed them.

We feel compelled, by the Act of 1844, to refuse injunctions in cases like this, at least until the legislature shall provide for giving bond or dispense with the necessity of it.

Motion for preliminary injunction refused.